IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HENRY LEONEL BARRERA AYALA,<br>    a/k/a "Cusuco,"<br>    a/k/a "Centinela,"<br>    a/k/a "Lil Player,"<br><br>        *Defendant.* | No. 1:22-cr-178-MSN-2<br><br>Sentencing: February 13, 2025 |

## UNITED STATES' POSITION WITH RESPECT TO SENTENCING

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("guidelines" or "U.S.S.G."), hereby submits its position with respect to the sentencing of the defendant, Henry Leonel Barrera Ayala. The defendant pled guilty to a racketeering conspiracy offense arising from his participation in murders committed in furtherance of the interests of *La Mara Salvatrucha*, also known as MS-13, the violent transnational gang of which he was a member. The government has reviewed the Presentence Investigation Report ("PSR") and concurs with the findings of the Probation Office, which has correctly calculated that the defendant falls in criminal history category I. Pursuant to the Plea Agreement, the defendant pled guilty to Count One of the Third Superseding Indictment (ECF 271), which charged Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d), and alleged three murders as special sentencing factors. With a total offense level of 43 and a criminal history category of I, the defendant faces life in prison under the guidelines. In keeping with the Plea Agreement negotiated by the parties in this case and for the reasons stated below, the government respectfully requests

1

that the Court sentence the defendant to 600 months' imprisonment, to be followed by five years of supervised release.

I. **OVERVIEW OF APPLICABLE LAW**

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.* Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

Although the guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the Court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citations omitted). Indeed, in the ordinary case, there will be a significant amount of overlap between the guidelines range and the remaining § 3553(a) factors, because the guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

For example, the guidelines encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an offense level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflect "the history and characteristics of the defendant" (most notably by

2

establishing a criminal history category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they were sentenced. *Id.* § 3553(a)(6); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus, although the guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

**II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

In 1961, real estate entrepreneur Robert E. Simon used the proceeds of his family's sale of Carnegie Hall in Midtown Manhattan to buy nearly 7,000 acres of land in Fairfax County, Virginia. Robert D. McFadden, *Robert E. Simon Jr., Who Created a Town, Reston, Va., Dies at 101*, N.Y. Times, Sept. 21, 2015.[1] A few years later, he launched Reston – Northern Virginia's first planned community. *Id.* Today, Reston is home to many affluent residents, countless technology firms, and a high-end town center. But Reston – particularly the Hunters Woods area – is also home to a large number of working class immigrants, many of whom hail from the San Vicente Department of El Salvador. These immigrants came to the United States in search of a better life live. Many of them

---

[1] https://www.nytimes.com/2015/09/22/realestate/communities/robert-e-simon-jr-founder-of reston-va-dies-at-101.html

3

live in apartments and duplexes that abut both sides of Reston Parkway between Fox Mill Road and South Lakes Drive. Unfortunately for the hardworking members of this community, MS-13's *Uniones Locos Salvatrucha* clique (hereinafter, "ULS") has long considered their neighborhood to be its "*cancha*," or turf.

While the majority of the murders in this case occurred in Reston, the first one did not. On August 25, 2018, a young men named Kevin Abarca Choto ("Choto") was lured to the residence of ULS member Franklin Amaya Paredes, a/k/a Mosca," where Choto ate dinner with the defendant and other MS-13 members. *Id.* at ¶¶ 35, 36. After dinner, the defendant was one of three men who remained inside the residence with Choto and murdered him by strangling him with a belt and striking him to force air out of his lungs. *Id.* at ¶¶ 36, 52. The defendant and his fellow gang members then decapitated and dismembered Choto in a bathtub before bagging his remains and burying them in a clandestine grave in nearby woods. *Id*. at ¶ 37-38. Choto's remains have yet to be recovered at the time of this writing. His mother desperately wants them found.

In the same aforementioned Reston neighborhood that ULS considered part of its turf, a group of men who congregated in the woods behind Hunters Woods Village Plaza drew the gang's ire. PSR at ¶ 40. Some of the men who congregated in the woods pedaled drugs, some of them shoplifted alcohol from local businesses, and most, if not all of them, drank heavily in public. *Id.* Their activities attracted police attention, which threatened ULS' drug dealing operation and its grip on its perceived turf. *Id.*

On June 22, 2019, the defendant and other ULS members and associates gathered in a hotel room at the Extended Stay America hotel in Fairfax and hatched a plan that involved traveling to what they believed was their turf and killing one or more of these men. *Id.* In the early morning

hours of June 23, 2019, the defendant and his fellow MS-13 members went to the Hunters Woods area to carry out their attack. *Id.* The defendant and three other MS-13 members remained in getaway vehicles while five of their co-conspirators went into the woods armed with firearms and machetes. *Id.* at 42. They murdered Jose Guillen Mejia ("Guillen"), the first man they encountered. Those five MS-13 members shot and hacked Guillen to death. *Id.*. They left Guillen's body next to a footpath in the woods for others to find and collect like the beer cans that littered the area where he died.

More than a year later, in September 2020, ULS decided to leave someone else's body to be discovered on its perceived turf – this time down the street from an elementary school. Iris Ponce Garcia ("Ponce") had maligned MS-13 on social media and represented herself as an associate of MS-13's archenemy, the 18th Street Gang. *Id.* at ¶¶ 44, 54. In MS-13's eyes, these were capital crimes. After communicating with the defendant via Snapchat, Ponce got into a car with him and Jose Lozano Duran, a/k/a "Neyka," shortly after midnight. *Id.* at ¶¶ 45, 54. She had no idea that the defendant and his friend were MS-13 homeboys who were leading her to the slaughter. *Id.* at ¶ 45. She got out of the car near the intersection of Colts Neck Road and Insha Court, where two other MS-13 members were lying in wait. *Id.* at ¶ 45. The 19-year old waitress was hardly a match for the defendant and the three other men who shot her repeatedly in the head and upper torso. While the gunshots rang out loud, there was no moon that night, and cars were parked along the curb over which she died sprawling. Her body was not found on the side of Colts Neck Road until hours later close to sunrise.

On September 18, 2024, pursuant to a Plea Agreement, the defendant pled guilty to Count One of the Third Superseding Indictment, charging him with Conspiracy to Participate in a

5

Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d), with the murders of Choto, Guillen, and Ponce alleged as special sentencing factors. ECF 403, 404. As part of that agreement, the parties agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that the defendant would receive a sentence of 600 months. *See* ECF 404 at ¶ 5.

### III.   DISCUSSION

#### A.   Sentencing Guidelines

The government has no objection to the applicable guidelines calculated in the PSR. The guideline for Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C. § 1962(d), is U.S.S.G. § 2E1.1. Pursuant to Application Note 1 of U.S.S.G. § 2E1.1, each racketeering offense in Count One is treated as a "pseudo count." PSR at ¶ 66. Each "pseudo count" that is based on murder has both a base offense level and also an adjusted offense level of 43, pursuant to U.S.S.G. § 2E1.3(a)(2) by cross-reference to U.S.S.G. § 2A1.1(a). *Id.* at ¶¶ 73, 78, 79, 84, 85, and 90. The "pseudo count" based on drug trafficking has a base offense level of 12, pursuant to U.S.S.G. § 2E1.1(a)(2) by cross-reference to U.S.S.G. § 2D1.1(a)(5)(C)(14); a two-level enhancement for a dangerous weapon applies under U.S.S.G. § 2D1.1(b)(1), and thus the adjusted offense level is 14. *Id.* at ¶¶ 67-72. Adjusting for multiple counts pursuant to U.S.S.G. § 3D1.4, there are three units. *Id.* at ¶ 91. Taking the greater of the adjusted offense levels from the "pseudo counts" (i.e., 43) and adding the additional three-level increase due to the total number of units, the combined adjusted offense level is 46. *See* U.S.S.G. § 3D1.4; *see also* PSR at ¶¶ 93, 94.

The defendant has demonstrated acceptance of responsibility, and he should receive a two-level reduction under U.S.S.G. § 3E1.1(a). PSR at ¶¶ 96. Because the defendant qualifies for a two-level decrease in offense level pursuant to U.S.S.G. § 3E1.1(a), and the offense level prior to

6

the operation of that section is a level 16 or greater, the government – as agreed to in the Plea Agreement – moves for an additional one-level decrease, pursuant to U.S.S.G. § 3E1.1(b). *See* PSR at ¶ 97. Thus, the defendant has a total offense level of 43. PSR at ¶ 98.

Based on the defendant's lack of criminal history, the defendant falls into criminal history category I. *Id.* at ¶ 104. The advisory guidelines for a defendant with an offense level of 43 and a criminal history category of I is life in prison, to be followed by two to five years of supervised release. *Id.* at ¶¶ 128.

### B.     Section 3553(a) Factors

The Section 3553(a) factors in this case counsel in favor of imposing a term of 50 years' imprisonment, to be followed by five years of supervised release.

In this case, a 50-year custodial sentence appropriate and warranted based on several factors. The ULS clique murdered multiple victims over several years, often targeting individuals that MS-13 perceived to be problematic for some reason, such as those believed to be associated with rival gangs and sometimes even those associated with MS-13. This defendant was a part of MS-13 for years and murdered multiple people during his tenure with the gang. He also conspired to murder others and nearly made it to Winterthur Court in time to murder Santos Trejo Lemus in March of 2021. *Id.* at 55. The nature, circumstances, and seriousness of the defendant's conduct are abundantly clear.

In addition, a 50-year sentence is necessary to promote respect for the law, to provide just punishment, to adequately deter future criminal conduct by the defendant and others, and to communicate to the public the seriousness of these offenses. The seriousness of the defendant's conduct cannot be understated, and the need to promote respect for the law is apparent here. *La*

*Mara Salvatrucha* is a thief. MS-13 robs its victims of their lives. It robs those victims' loved ones of their children, parents, spouses, and friends. It robs the young men who make up its ranks of their futures, skyrocketing the likelihood they will be killed or spend decades in prison after they are eventually called upon to move up the gang's ladder. It robs those dead and incarcerated members' children of their fathers. It robs the communities in which it operates of their sense of security. It robs those who left everything and everyone behind fleeing gang violence in Central America of their optimism that things will be different here in the United States.

MS-13 maintains a significant presence throughout the Eastern District of Virginia, and many murders and other crimes have been attributed to the gang in recent years. A 50-year sentence would signal not only to the defendant but also to others considering participating in a violent racketeering conspiracy that such conduct will not be tolerated and carries significant penalties. Moreover, while a five-decade prison sentence will not bring back the victims, it will bring some measure of justice to the victims' families.

The government credits the defendant for taking responsibility in this case. As discussed in the PSR, the defendant's youth was marred by significant difficulties in El Salvador and in the United States. That said, nothing that the defendant experienced justifies the decision to be and remain an MS-13 gang member that he made each and every day for years.

The government believes that a five-year period of supervised release is appropriate in this case. Ordinarily, a court should not impose a term of supervised release in a case, like this one, in which supervised release is not required by statute and the defendant is a deportable alien. U.S.S.G. § 5D1.1, comment. (n.5). A court should, however, consider imposing a term of supervised release on such a defendant if it determines that doing so "would provide an added measure of deterrence

8

and protection based on the facts and circumstances of the particular case." *Id.* Given that the defendant, during his time in the United States, played a role in multiple murders, such an added measure of deterrence and protection is needed and can be achieved by imposing a term of supervised release.

For conditions of supervision, the government requests the mandatory, standard, and special conditions listed in the PSR. PSR at 21-25. Regarding monetary penalties, as part of the Plea Agreement, the defendant must pay the mandatory special assessment of $100. In addition, the defendant has agreed to pay restitution to the families of the three victims whose murders were alleged to constitute special sentencing factors in Count One of the indictment to which he pled. The government anticipates that the parties will tender a restitution Order to the court at the defendant's sentencing hearing.

### IV. RECOMMENDATION

Based on the foregoing, the government asks the Court to sentence the defendant to 600 months' imprisonment, to be followed by five years of supervised release. Such a sentence would account for the nature of the crimes, promote respect for the law, and provide the requisite level of specific and general deterrence.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:  /s/
John C. Blanchard
Megan C. Braun
Natasha Smalky
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I certify that on February 6, 2025, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will cause a true and accurate copy of this document to be transmitted to counsel of record.

By:           /s/         
John C. Blanchard
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3999
Fax: (703) 299-3980
John.Blanchard@usdoj.gov